**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JENNIFER T. HOLLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15 C 11837** |
| | ) | |
| **JONES, LANG LASALLE AMERICAS, INC.,** | ) | |
| **MATTHEW LANDEK, and CATHERINE** | ) | |
| **KLINGER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Jennifer Hollis has filed suit against her former employer, Jones, Lang LaSalle

Americas, Inc. (JLL) and two of its employees, Matthew Landek and Catherine Klinger,

alleging that they discriminated against her due to her race, sex, and age in violation of

42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in

Employment Act (ADEA) (counts 1–5).  Hollis also alleges violations of state law,

including civil conspiracy, intentional misconduct, and negligent supervision (counts 6–

8).  Finally, she alleges that she received less pay than male employees in violation of

the Equal Pay Act (EPA) (counts 9–10).  Defendants have moved for summary

judgment on all counts.  For the reasons stated below, the Court grants summary

judgment in favor of defendants on counts 9 and 10 and partially grants summary

judgment in their favor on counts 3–5, but otherwise denies defendants' motion.  The

Court also denies Hollis's request to dismiss without prejudice counts 6–8.

**Background**

Because defendants have moved for summary judgment, the Court views the evidence in the light most favorable to Hollis and draws reasonable inferences in her favor. *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 503–04 (7th Cir. 2014).

Prior to 2014, Hollis—a black female born in 1961—worked for a company called Transwestern as the assistant facility manager on an account for the Mars / Wrigley corporation. In January 2014, JLL, a commercial real estate corporation, won a bid to take over for Transwestern and provide real estate management services to Mars / Wrigley. That same month, JLL hired Hollis to continue on as the assistant facility manager on the account at a salary of $67,594. Janet Peterson, the account lead for Mars / Wrigley, acted as Hollis's supervisor. Hollis was responsible for managing budget reports, invoicing, property inspections, third-party contracts, and work-order systems for four to six buildings within the account. In March 2015, JLL changed Hollis's title to facility manager. Hollis also received a raise, resulting in a salary of $70,000.

Soon after this change, Peterson suggested to Hollis that she explore other positions at JLL to avoid being pigeon-holed at the company. Defs.' Statement of Undisputed Material Facts (SUMF), Ex. 1 (Hollis Dep.) at 38:13–39:2. Peterson recommended that Hollis broaden her skillset by seeking opportunities on accounts involving something other than owner-occupied facilities, such as high-rise facilities with multiple tenants or retail spaces. *Id.* at 39:22–40:6. At Peterson's suggestion, Hollis arranged a meeting with Peterson and Klinger, a human resources manager at JLL. *Id.* at 40:6–10. The three women discussed other opportunities for Hollis, including

2

positions that might enable Hollis to work from home or relocate to Cincinnati, as well as positions involving multi-tenant facilities. *Id.* at 41:18–42:1. Klinger asked Hollis for her resume and offered to help Hollis tailor it to apply for positions in other departments. *Id.* at 42:1–3, 46:23–4.

On April 22, 2015, Hollis sent Klinger an email in which she stated: "Pursuant to our previous conversations, I am looking for new career opportunities within JLL. I am interested in positions where you would work from home or positions in Cincinnati, OH." Defs.' SUMF, Ex. 2 at 8. Hollis attached her resume and cover letter for Klinger to review to determine which positions would be the best fit. *Id.* Klinger responded with suggestions for improvements to Hollis's resume. *Id.* at 7. On May 17, 2015, Hollis emailed Klinger to tell her that she had applied for four open positions at JLL. *Id.* at 11. Klinger then told Hollis that she had forwarded Hollis's resume directly to the recruiters for those four positions. *Id.* at 9.

Meanwhile, beginning May 2015, JLL began reorganizing the Mars / Wrigley account. Peterson transitioned off the account, and Landek took over for her as the account lead. According to defendants, Landek and Sharon Feller, regional account director for JLL, decided to add two new positions to the account: senior facility manager and operations manager. Landek brought in Jason Epstein—a Caucasian male born in 1980—to work on the Mars / Wrigley account. Epstein had previously worked under Landek on the Catamaran account. In April 2015, Epstein told Landek that he wanted to transition off the Catamaran account. Landek sent him the following e-mail:

> Just wanted to ensure that you and I are in agreement and have clear understanding / expectation since our meeting yesterday. JLL will be

3

> actively recruiting for your replacement on the Catamaran Account.
> During that time, you should be applying for other roles in the firm. Feel
> free to block time on my calendar next week if you'd like to walk through
> some of the various roles on the JLL site. In the event that we find a
> replacement for your position prior to you identifying a role, JLL will have
> you work in a variable capacity for the IFM On Demand platform until our
> agreed upon date of June 15, 2015. If you are able to identify a role prior
> to June 15th we will work with the hiring team for that account on a
> transition date.

Defs.' SUMF, Ex. 10 (Epstein Email) at 2. Following this email, Epstein met with both

Landek and Klinger to discuss positions posted in the JLL database for which he might

apply. Epstein Dep. at 45:15–46:1, 73:7–21. Epstein applied for a few of these

positions and had one interview but was not hired. *Id.* at 74:21–75:11.

In May 2015, Landek told Epstein about the operations manager position on the

Mars / Wrigley account, and Epstein accepted the position. Epstein does not know

whether this position was posted in the JLL database but believes it was not in the list of

database positions that Landek showed him. *Id.* at 77:8–21. When asked whether

Landek had created the position specifically for him, Epstein stated his understanding of

the position was that "there was an opportunity, and it could be up to [him] to define

what that opportunity is." *Id.* at 48:3–8. Regardless, Epstein agrees that it was through

Landek's efforts that he was hired as the operations manager on the Mars / Wrigley

account. *Id.* at 81:5–17.

According to Landek, at some point during May 2015 human resources informed

him that Hollis had expressed a desire to move off of the Mars / Wrigley account. Pl.'s

Add'l Statement of Undisputed Material Facts (ASUMF), Ex. 9 (Landek Dep.) at 93:2–

15. On May 11, Landek sent Klinger an email stating, "Jennifer Hollis has been sitting

in limbo, looking to redeploy for some time. Can we move forward with giving her an

end date for transition. I'm thinking 7/1/15." Defs.' SUMF, Ex. 8 at 3. Klinger

responded the same day:

> Let's talk about this. She and Janet approached me last month about her wanting to look for something different but it was not a discussion where an end date was set. I reviewed her resume and gave her feedback on 4/22. We left it that she was going to revise and send to me again but I haven't heard back.

*Id.* Hollis denies that she told anyone that she was interested in moving off the Mars / Wrigley account. Resp. to Defs.' SUMF ¶ 32.

On May 26, 2015, Landek held an all-staff meeting for the Mars / Wrigley account during which he introduced himself as the new account lead, announced the planned restructuring and the addition of two positions, and introduced Epstein. After the meeting, Hollis approached Landek and Feller to ask about the reorganization. Hollis wanted to know what her role would be going forward, given that the account now appeared "top-heavy" with three management positions: senior facility manager, facility manager, and operations manager. Hollis Dep. at 57:17–58:5. Landek then told Hollis that she was being transitioned off of the account with a target date of July 15, 2015. *Id.* at 58:7–21. He also told her that JLL would be actively looking for a replacement for her position. *Id.* at 59:1–7. According to Hollis, this was the first time she learned that JLL planned to move her off the Mars / Wrigley account.

The next day, Landek sent Hollis an email regarding the transition similar to the one he had sent Epstein:

> Just wanted to ensure that you and I are in agreement and have clear understanding / expectation since our meeting yesterday. JLL will be actively recruiting for your replacement on the Mars Wrigley Account. During that time, you should be applying for other roles in the firm. Feel free to block time on my calendar next week if you'd like to walk through some of the various roles on the JLL site. In the event that we find a replacement for your position prior to you identifying a role, JLL will have you work in a variable capacity for the firm until our agreed upon date of July 15, 2015. If you are able to identify a role prior to July 15th we will

work with the hiring team for that account on a transition date.

Does this jive with your understanding as well?

Defs.' SUMF, Ex. 2 at 13.  Hollis responded:  "Thanks for the recap; yes, this is how I understand the process going forward."  *Id*.  Defendants contend that Hollis never blocked out time on Landek's calendar to look for other roles; Hollis alleges that Landek was never available.  Resp. to Defs.' SUMF ¶ 54.  On June 1, JLL posted Hollis's position on the JLL job search database.

On June 24, Hollis emailed Klinger to tell her that she had applied for two more positions and to ask about the status of her other four applications.  Defs.' SUMF, Ex. 2 at 15.  Klinger responded that one of the positions had closed and that she contacted the recruiters for the remaining three.  *Id*.  On June 25, Hollis emailed Landek and Klinger to ask about the impact of her transition on severance pay, vacation time, and benefits.  *Id*. at 21.  On June 30, Klinger responded and indicated there would be no severance because July 15 was "a mutually agreed upon last day."  *Id*. at 20.

On July 1, Hollis emailed Klinger "to provide [ ] a recap of . . . the events over the past few weeks."  *Id*. at 18.  She indicated that the conversation with Landek following the all-team meeting was the first time she learned that she was being replaced.  *Id*.  She said she was shocked and, when she asked about being placed somewhere within the firm, was told that she would have to search for other jobs.  *Id*.  Hollis stated that she was not aware that indicating she understood her last day was July 15 constituted an agreement to leave the firm.  *Id*.  She also told Klinger that, approximately one week after this meeting, she had asked Landek why she was being replaced.  *Id*. at 19.  Hollis said that Landek told her that it was both because of her personality and her skillset, and that Mars / Wrigley was looking for someone with a more technical background.  *Id*.

6

On July 2, Hollis again emailed Klinger:

> Pursuant to our conversation this morning (10:01am), you confirmed that
> according to your understanding that I agreed to leave my position as of
> July 15 based on information you received from Matt Landek.  This was
> not the case nor my understanding on the events that were to transpire
> with regards to the realignment of the management staff for the Mars /
> Wrigley account.  I did, however, indicate that I understand the process
> going forward but that was in no way stating that I was resigning my
> employment voluntarily . . . .  I continued to seek employment with JLL
> during this process with no results to date.  Therefore, I will seek legal
> consultation regarding this matter if not resolved.

*Id.* at 17.

During a phone call on July 8, Landek and Klinger told Hollis that her transition

date would be pushed back to August 14, 2015.  Resp. to Defs.' SUMF ¶ 66.

Defendants maintain that they extended the deadline in order to give Hollis more time to

find another position.  Hollis contends that the only reason for the extension was that

the person to whom JLL had offered the facility manager position had turned it down.

On July 9, Landek emailed Hollis a transition memo recapping their recent discussions,

which he asked her to sign.  Defs.' SUMF, Ex. 2 at 24.  Hollis refused to sign the

document because she disagreed with Landek's characterization that she had

expressed a desire to move off of the Mars / Wrigley account.  *Id.* at 23.  She reiterated

her belief that JLL had unilaterally decided to replace her.  She stated "[t]here can be no

question that I am not voluntarily leaving my position with JLL.  I never agreed to a final

date, rather was told by you what my final date would be."  *Id.*

Hollis asserts that, at some point during these events, she submitted an online

application for her position as facility manager on the Mars / Wrigley account but that

Landek refused to allow her to stay in the position.  Landek testified during his

deposition that Hollis never told him that she wanted to stay in her position.  Landek

Dep. at 142:6–12.  When asked whether Hollis's employment would have been terminated if she had asked to stay on the Mars / Wrigley account, Landek stated:  "No. I don't have the authority to terminate someone."  *Id.* at 146:13–19.

In July 2015, JLL hired Martin Kelly, born in 1963, to serve as the senior facility manager on the Mars / Wrigley account.  On July 16, Kelly emailed Landek to ask about elevating Epstein to the facility manager position.  Defs.' SUMF, Ex. 8 at 2.  Landek forwarded the email to Feller and stated, "[a]light [sic], so it looks like I'm the lone holdout here for this and I can get over it.  We could promote him to FM and hire an internal person for the Operations role."  *Id.*  Feller responded that she loved the idea. *Id.* at 1.

By August 14, 2015, Hollis failed to find another position at JLL, and her employment was terminated.  She did not receive a severance package, and she contends that she was unable to collect unemployment benefits.  On August 15, JLL promoted Epstein to facility manager at an initial salary of $63,495.  In October 2015, his salary was increased to $70,000.

Hollis then filed this suit against JLL, Landek, and Klinger.  Hollis asserts multiple claims of disparate treatment and a hostile work environment.  In count 1, she brings a claim under 42 U.S.C. § 1981 in which she alleges that JLL, Landek, and Klinger deprived her of equal protection by engaging in a campaign to terminate her employment due to her race.  In count 2, Hollis brings a claim under 42 U.S.C. § 1981 against Landek and Klinger in which she alleges that they were personally responsible for the racially discriminatory conduct that led to her termination.  Hollis alleges in count 3 that this same conduct by all three defendants constitutes discrimination on the basis

of race and sex in violation of Title VII of the Civil Rights Act of 1964. In count 4, Hollis alleges that her wrongful termination was also the result of age discrimination in violation of the ADEA. In count 5, Hollis alleges that this age discrimination was willful. Hollis alleges in count 6 that Landek and Klinger engaged in a civil conspiracy to create a racially hostile environment and to fabricate a reason to terminate her employment. In count 7, she alleges that all three defendants engaged in intentional misconduct in violation of their duties of reasonable care, honesty, good faith, and fair dealing. Hollis alleges in count 8 that defendants negligently failed to train, supervise, and monitor their employees to prevent Hollis's wrongful termination. In count 9, she alleges that defendants paid Epstein—a male employee—a higher salary than Hollis in violation of the EPA. She alleges in count 10 that this violation was willful.

## Discussion

Defendants have moved for summary judgment on all of Hollis's claims. They contend that Hollis cannot sustain any claim of disparate treatment based on race, sex, or age discrimination because she has not offered a similarly situated comparator who received better treatment, nor can she demonstrate that JLL's legitimate reason for her termination was pretextual. Defs.' Mem. in Supp. of Their Mot. for Summ. J. 3–5. Defendants also argue that Hollis cannot maintain any claims for a hostile work environment because the conduct alleged was not sufficiently pervasive or severe and it was not related to Hollis's age, race, or sex. *Id.* at 6–9. Defendants next argue that Hollis cannot maintain a claim under the EPA because she has failed to present evidence suggesting any male employee with similar responsibilities received a higher salary. *Id.* at 9. Finally, they argue that Hollis cannot maintain any of her state law

claims because they are all preempted by the Illinois Human Rights Act (IHRA), and she has failed to provide evidence supporting the elements of each claim. *Id.* at 9–13.

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the non-moving party. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Summary judgment is appropriate when there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. *Nicholson v. City of Peoria*, 860 F.3d 520, 522 (7th Cir. 2017).

## A. Discrimination

Hollis alleges that defendants discriminated against her due to her membership in three different protected classes based on the same course of conduct. Hollis alleges that defendants fabricated a reason to terminate her employment without cause, failed to help her find another position within JLL to which she could transfer, and manufactured evidence that she voluntarily resigned. Hollis, a black female who was 54 years old at the time of her termination, contends that she was treated less favorably than Epstein, a white male 19 years younger than Hollis. Hollis contends that this constitutes disparate treatment based on race in violation of section 1981 (counts 1 and 2), based on race and sex in violation of Title VII (count 3), and based on age in violation of the ADEA (counts 4 and 5). For purposes relevant to this motion, courts use the same framework to evaluate disparate treatment claims under these three statutes. *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) ("The legal analysis for discrimination claims under Title VII and § 1981 is identical."); *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 599–600 (7th Cir. 2010)

(applying the same framework to claims under Title VII and the ADEA).  And defendants make the same arguments in support of summary judgment on each of Hollis's disparate treatment claims.  *See* Defs.' Mem. in Supp. of Their Mot. for Summ. J. 3–6. The Court will therefore consider these claims together.

Hollis also contends that the same conduct created a hostile work environment. Section 1981, which protects only against race discrimination, does not provide relief for this type of claim.  Therefore Hollis brings her claims of a hostile work environment based on sex and race under Title VII (count 3), and based on age under the ADEA (counts 4 and 5).  The same standard applies to hostile work environment claims brought under both of these statutes.  *See Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008); *Darbha v. Capgemini Am. Inc.*, 492 F. App'x 644, 646–47 (7th Cir. 2012).  The Court therefore considers them together.

### 1. Disparate treatment

The Seventh Circuit recently clarified the proper analysis for disparate treatment claims by removing the distinction between direct and indirect evidence.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763–64 (7th Cir. 2016).  Instead, the Court must evaluate all evidence in the context of a single question:  whether a reasonable jury could conclude that Hollis would have suffered from the adverse action if she had a different ethnicity, sex, or age, and everything else had remained the same.  *See id.* at 764; *David*, 846 F.3d at 224.  When answering this question, courts may still use the *McDonnell Douglas* burden-shifting framework to evaluate circumstantial evidence of discrimination.  *David*, 846 F.3d at 224.  Under this framework, plaintiff bears the initial burden of establishing that (1) she is a member of a protected class, (2) her job

11

performance met her employer's legitimate expectations, (3) despite her performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by her employer. *Id.* at 225. If plaintiff meets this burden, the employer "must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.*

The parties used this burden-shifting framework when making their arguments on summary judgment, so the Court does the same. Defendants argue first that Hollis cannot establish the prima facie case because her proposed comparator—Epstein—is not similarly situated. They also argue that, even if Hollis can do so, she cannot show that their nondiscriminatory reason for her termination is pretextual.

### a. Similarly situated

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Thus, under the similarly situated element, plaintiff must point to a similarly situated employee outside the protected class who did not suffer the adverse action. A similarly situated employee "is one whose performance, qualifications, and conduct are comparable" to the plaintiff's "in all material respects," but he need not be identical in every conceivable way. *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014) (internal quotation marks omitted). The purpose of this requirement is to eliminate other possible explanatory variables— such as differing roles, performance histories, or decision-making personnel—in order

12

to isolate the presence of discriminatory animus.  *Coleman*, 667 F.3d at 846.

Hollis offers a single comparator for each of her three disparate treatment claims based on race, sex, and age:  Epstein.  Hollis argues that she and Epstein are similarly situated—other than her membership in the protected classes—and that defendants treated him more favorably in assisting him to transfer to another position within JLL. Defendants contend that, because Epstein found a position before the expiration of his transfer deadline, he and Hollis are not similarly situated.  Defs.' Mem. in Supp. of Their Mot. for Summ. J. at 3.  Defendants argue that, because Hollis has not pointed to any male employee who was allowed to stay on after failing to find a position by the established transfer deadline, she cannot meet the prima facie case of discrimination.

Defendants appear to have missed the thrust of Hollis's argument.  Hollis does not argue solely that she suffered disparate treatment because she was terminated and Epstein was not.  Instead, she contends that she and Epstein are similarly situated because they both faced the possibility of a transfer to another position at JLL but did not receive the same level of assistance.  Thus the fact that Epstein found a position before his transfer deadline passed is irrelevant in determining whether he was similarly situated—and received more favorable treatment—prior to this deadline.

Hollis has provided evidence from which a reasonable jury could conclude that she and Epstein are similarly situated with regard to a potential transfer.  Both Hollis and Epstein spoke with Klinger about the possibility of a new position within JLL.[1]  *See*

---

[1] Hollis contends that she was forced into this by JLL, but that is insignificant in assessing whether they are similarly situated.  In addition, there is evidence that Epstein was moving because of a performance deficiency—which is not the case for Hollis—but a reasonable jury could find that, if anything, this would warrant *greater* consideration for Hollis in securing a transfer, not less.

Defs.' SUMF, Ex. 2 at 8; Epstein Dep. at 45:15–46:1. They both wanted to remain with the company and sought assistance from their supervisors with making a transition. Because of Landek's transfer from the Catamaran account to the Mars / Wrigley account, he was the account lead who oversaw both Epstein's transition request and Hollis's alleged transition request. Thus Hollis and Epstein sought the same accommodation from defendants and dealt with the same decision-maker. A reasonable jury could therefore conclude that Hollis and Epstein are similarly situated for the purposes of Hollis's claims of disparate treatment.

Further, there is a genuine dispute regarding whether Epstein was treated more favorably. Epstein met with Landek and Klinger multiple times to discuss other positions at JLL, whereas Landek never met with Hollis. Epstein Dep. at 45:15–46:1, 73:7–21; Resp. to Defs.' SUMF ¶ 54. Defendants contend that this is because Hollis never requested a meeting, but a reasonable jury could find that Landek deliberately put more effort into assisting Epstein. Epstein testified that he met with Landek to review positions from the JLL database and that he applied for many of these positions but was not hired for any of them. He testified that Landek is the one who suggested the operations manager position on the Mars / Wrigley account, and his testimony suggests that the position was not listed in the JLL database. The evidence therefore suggests, as Hollis contends, that Landek created the position to ensure that Epstein—a young, white, male employee—would find another spot within JLL and would not be terminated. Because the same accommodation was not made for Hollis—an older, black, female employee—a reasonable jury could determine that she has made out a prima facie case of disparate treatment based on race, sex, and age. *See Hnizdor v. Pyramid*

14

*Mouldings, Inc.*, 413 F. App'x 915, 918 (7th Cir. 2011) ("If, on the other hand, [the employer] had implemented 'internal job placement services' to help [plaintiff's] younger colleagues land on their feet, then the company's failure to extend the same opportunities to Hnizdor might have put it on the wrong side of the ADEA.").

### b. Pretext

Defendants next contend that, even if Hollis can make out a prima facie case of discrimination, she cannot show that their legitimate nondiscriminatory reason for her termination was pretextual. They contend that Hollis agreed to a transfer deadline of July 15, 2015. This deadline was extended to August 14, 2015 and, when Hollis failed to find a new position by this date, her employment was terminated in accordance with the agreement.

To establish pretext, Hollis must show that defendants' reason for her termination "was a lie—not just an error, oddity, or oversight." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010). A court looks for evidence that the employer "is dissembling to cover up a discriminatory purpose." *David*, 846 F.3d at 229.

Hollis has presented evidence from which a reasonable jury could conclude that defendants' alleged nondiscriminatory reason for termination was pretextual. First, evidence suggests that Hollis did not want to transfer off of the Mars / Wrigley account and did not ask to do so. Hollis met with Klinger only at the suggestion of Peterson, who told her that she needed to expand her skillset. Hollis Dep. at 38:13–39:2, 39:22–40:6. Hollis testified, however, that she was unaware these discussions constituted an agreement to leave the company, or even a firm commitment to leave the Mars / Wrigley account. *See* Hollis Dep. at 80:11–81:10. She says that she first learned she

15

was to be moved off the account at the all-staff meeting on May 26, where Landek introduced Epstein and the account reorganization. Although Landek did at that time give Hollis a transition date of July 15, Hollis says that she was unaware this meant she must leave the company after that date if she failed to find another position.

Once Hollis understood the nature of the transition deadline, she repeatedly expressed her confusion and concern in emails to Klinger and Landek. On July 1, she told Klinger that she was not aware that indicating she understood her last day was July 15 amounted to an agreement to leave the firm after that date. Defs.' SUMF, Ex. 2 at 18. She reiterated this sentiment in another email on July 2, in which she told Klinger that she was in no way voluntarily resigning her employment with JLL. *Id.* at 17. Finally, Hollis refused to sign a transition memo that Landek sent her, telling Landek that she disagreed with his statement that she had expressed a desire to move off the Mars / Wrigley account. *Id.* at 23. She stated that she "never agreed to a final date" and instead "was told by [Landek] what [her] final date would be." *Id.*

Landek agrees that Hollis never told him personally that she wished to transfer off the account. He claims that Feller and Peterson told him Hollis wanted to leave. Landek Dep. at 93:2–15. But Hollis never spoke with Feller regarding a transfer. Resp. to Defs.' SUMF ¶ 32. And Peterson testified that she was not aware that Landek wanted to establish a transfer deadline for Hollis and that Hollis has never expressed to her a desire to leave JLL. Pl.'s ASUMF, Ex. 11 (Peterson Dep.) at 57:11–58:19. Further, when Landek emailed Klinger to ask to set a deadline for Hollis's transition, Klinger indicated they should talk first because she, Hollis, and Peterson had never set an end date during their prior discussions. Defs.' SUMF, Ex. 8 at 3. And when Hollis

16

asked Landek why she was being replaced, Landek told her that it was because of her personality and lack of technical experience, not because she had requested to move off of the account. *Id*. at 19.

Finally, defendants have maintained throughout this lawsuit that, because Hollis failed to find a job before the transfer deadline, her employment was terminated. *See, e.g.*, Defs.' Mem. in Supp. of Their Mot. for Summ. J. at 1. Landek testified, however, that Hollis's employment paperwork lists that her termination was a resignation by mutual consent. Landek Dep. at 119:23–121:10.

Taken together, this evidence undermines defendants' contention that Hollis voluntarily agreed to leave her position on the Mars / Wrigley account. Shifting or changing stories by an employer regarding the circumstances of the employee's separation is evidence of pretext. *See, e.g., Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013); *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003). In sum, a reasonable jury could conclude that defendants' nondiscriminatory reason for her termination was pretextual. The Court therefore denies defendants' motion for summary judgment on counts 1–5 to the extent they are based on claims of disparate treatment.

### 2. Hostile work environment

Hollis also claims that defendants created a hostile work environment based on her race and sex in violation of Title VII, and based on her age in violation of the ADEA. To prove a claim for hostile work environment, an employee must show that (1) she was subject to unwelcome harassment; (2) the harassment was based on a protected characteristic; (3) the harassment was severe or pervasive so as to alter the conditions

17

of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016). Defendants argue that they are entitled to summary judgment on Hollis's claims of a hostile work environment because the allegedly harassing conduct was not sufficiently pervasive and severe, and Hollis cannot show that it was related to her race, sex, or age.

No reasonable jury could conclude that the conduct Hollis alleges is sufficiently severe or pervasive to create a hostile work environment. Hollis alleges that defendants created a hostile work environment by fabricating a for-cause reason for terminating her and thereby depriving her of severance and unemployment compensation, and by attempting to bully her into signing documentation that would prove she voluntarily resigned from JLL. Am. Compl. ¶¶ 59–60, 73. The alleged "bullying," however, refers mainly to a few emails defendants sent stating that Hollis agreed to a transfer deadline of July 15. Even if Hollis did not agree to the deadline, this conduct does not qualify as severe harassment. *See Hendricks v. Ill. Dep't of Human Servs.*, 80 F. App'x 489, 491 (7th Cir. 2003) (employer who kept plaintiff from advancing professionally, reprimanded her, and denied her access to client files was entitled to summary judgment on plaintiff's hostile work environment claim). The Seventh Circuit has declined to permit claims of a hostile work environment where the evidence does not suggest an environment "permeated with intimidation, ridicule, and insult." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). Because the conduct Hollis alleges does not rise to this level of severity, the Court grants summary judgment in favor of defendants' on counts 3–5 to the extent they are based on a claim of a hostile work environment.

### 3. Summary

For the reasons discussed above, the Court denies defendants' motion for summary judgment on counts 1–5 to the extent that they are based on claims of disparate treatment. The Court grants summary judgment in favor of defendants on counts 3–5 to the extent that they are based on claims of a hostile work environment.

### B. State law claims

Hollis brings three claims under Illinois law, alleging that defendants are liable for civil conspiracy, intentional misconduct, and negligent supervision. Defendants have moved for summary judgment on the ground that these claims are preempted by the IHRA. In her response, Hollis asks to withdraw her state law claims without prejudice. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 15. Defendants argue that this request is improper under Federal Rule of Civil Procedure 41 and ask the Court to rule on their motion for summary judgment. Defs.' Reply in Supp. of Their Mot. for Summ. J. at 2 n.1. At this point in the litigation, dismissal of these claims without prejudice would be inappropriate, given the efforts that defendants have expended defending against these claims. Therefore, the Court denies Hollis's request to dismiss the claims without prejudice. Unless Hollis is willing to dismiss the claims with prejudice and without costs. the Court will be required to rule on defendants' motion for summary judgment on these claims.

### C. Equal Pay Act

Hollis alleges in counts 9 and 10 that defendants violated the EPA by paying her less than male employees, specifically Epstein. To establish a prima facie case of wage discrimination under the EPA, a plaintiff must show "(1) higher wages were paid to a

male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003).

Hollis has failed to provide evidence from which a reasonable jury could conclude that higher wages were paid to a male employee for equal work. In her amended complaint, Hollis contends that Epstein received a higher salary after taking over her position as facility manager. Am. Compl. ¶¶ 103–04. In her response to defendants' statement of facts, however, she concedes that both she and Epstein received salaries of $70,000. Resp. to Defs.' SUMF ¶¶ 14, 76. Thus Hollis cannot show that Epstein received a higher salary than her for similar work.

Hollis argues that defendants violated the EPA, not by paying Epstein more for similar work, but by paying him the same salary as Hollis when he lacked her experience and was "a documented poor performer." Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 14. This is insufficient to sustain a claim under the EPA. Seventh Circuit cases reciting the standard in this type of case all indicate that a comparable male employee must receive a *higher* salary than the female plaintiff. The Court has been unable to find any case in which the Seventh Circuit considered a claim that the male employee did not deserve *equal* pay. The Court grants summary judgment in favor of defendants on counts 9 and 10.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment [dkt. no. 46] on counts 9 and 10 and partially grants the motion for summary judgment on counts 3–5, striking the hostile work environment claims, but otherwise

20

denies defendants' motion. The Court also denies Hollis's request to withdraw or dismiss counts 6–8 without prejudice. The Court will assume that Hollis is willing to dismiss these claims with prejudice and without costs unless she advises the Court otherwise in writing within seven days of this order, in which case the Court will proceed to rule on defendants' motion for summary judgment on counts 6-8. The case is set for a status hearing on July 25, 2017 at 9:30 a.m. for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 20, 2017